Railway Co., 101 N. Y. 661, 5 N. E. 66; Reiss v. Steam Co., 128 N. Y. 107, 28 N. E. 24. We think the plaintiff has failed to sustain the burden cast upon him to establish negligence as a basis of recovery. Plaintiff's exceptions overruled, and judgment ordered for the defendant, with costs. All concur, except WARD, J., not voting.

FITZGERALD v. NEW YORK CENT. & H. R. R. CO.

(Supreme Court, Appellate Division, Fourth Department. January 18, 1899.)

1. INJURY TO BRAKEMAN—CAUSE—EVIDENCE.

Evidence that just before a train passed under a low bridge, four or five feet above the top of a car, a brakeman was on top of the car, in apparent good health, and that, after it passed under, he was found on top of the car with the back of his head crushed in, is sufficient to warrant a finding that his death was caused by the bridge.

2. SAME—ASSUMPTION OF RISK.

A brakeman does not assume the risk of a low bridge which he knows nothing of, and at which the railroad company has not erected warning signals, as required by Laws 1884, c. 439, § 2.

3. SAME—DAMAGES.

It is no indication that a jury, in giving a verdict for $3,500 for death of a person, was influenced by passion or prejudice, because the verdicts on two prior trials were for $3,000 each.

Appeal from trial term, Herkimer county.

Action by John Fitzgerald, administrator of Thomas Fitzgerald, deceased, against the New York Central & Hudson River Railroad Company. From a judgment on a verdict for $3,500, and from an order denying a motion for new trial, made on several grounds enumerated in Code Civ. Proc. § 899, defendant appeals. Affirmed.

Argued before HARDIN, P. J., and FOLLETT, ADAMS, WARD, and McLENNAN, JJ.

C. D. Prescott, for appellant.

Hadley Jones, for respondent.

HARDIN, P. J. This action was commenced September 19, 1889. The complaint alleges that on the 11th of November, 1887, Thomas Fitzgerald, plaintiff's intestate, was in the employ of the defendant as brakeman, and was making his first trip as such brakeman; that it was necessary and imperative, for the proper performance of his work, for him to go upon the tops of the freight cars when in motion; and that on the 11th of November, while in the discharge of his duties as such brakeman, he was ordered out on top of the freight train, which was then in motion, and, while he was engaged and occupied in the execution of his duties, the train was moving eastwardly in close proximity to a bridge overhanging the tracks of the road, and the intestate was struck by the bridge, and received injuries which caused his death. The bridge was located near the station known as "Green's Corners." It was alleged that the bottom of said bridge was only about four feet from the top of the freight car upon which Fitzgerald, the intestate, was standing at the time he was struck. It is alleged that no telltales or warning

signals were maintained by the defendant at or near the approaches to said bridge, although the defendant knew of the dangerous condition of the road at the point where the injuries were received. It is alleged the defendant "so carelessly and negligently" conducted its road that the intestate, while passing under said bridge "without any negligence or fault on his part, and while he was using due care," was struck and killed by coming in contact with the said bridge. On the 23d of January, 1889, letters of administration upon the goods, etc., of the intestate, were issued to the plaintiff. The intestate left, him surviving, his father and his mother, who were dependent upon him for support. The intestate was unmarried. The answer of the defendant admits its incorporation, and alleges that the accident to the intestate "was wholly due to the carelessness, negligence, want of care, and acts of the said Thomas Fitzgerald, and not otherwise."

The issues were first brought to trial in 1890, at a circuit court held in the county of Herkimer, and a verdict was rendered in favor of the plaintiff for $3,000. An appeal was taken from the judgment entered upon that verdict; and in February, 1891, the case was heard in the general term of the Fourth department, and an opinion was delivered which led to the reversal of the judgment, and in the opinion, which was reported in 59 Hun, 225, 12 N. Y. Supp. 932, it was said that a brakeman—

"Who is aware of the fact that no warning signals have been placed at a bridge which crosses the tracks, and that the bridge is so low as to render it dangerous, and who is injured by such bridge by reason of his not exercising the care necessary to enable him to escape the consequences of such defect, is guilty of contributory negligence which precludes his recovering damages from the railroad company, although the railroad company has violated the provision of chapter 439 of the Laws of 1884, requiring that suitable warning signals should be placed at such bridge."

At the trial then under review, Mitchell, the conductor of the train, was called as a witness in behalf of the plaintiff, and his credibility was thereby vouched for by the plaintiff, and gave evidence pertinent to the inquiry whether the plaintiff's intestate was free from contributory negligence.

The issues were again brought to trial at the Herkimer circuit, in 1894, and the jury rendered a verdict for $3,000 in favor of the plaintiff. A motion was made for a new trial, and denied, and an appeal was taken from the judgment, and the order entered upon that verdict. The appeal was heard and decided in July, 1895, and the opinion delivered by the court in the decision made of the appeal is reported in 88 Hun, 359, 34 N. Y. Supp. 824. Upon the trial then in review, Mitchell was not called in behalf of the plaintiff, but was called as a witness in behalf of the defendant; and the court, in deciding the appeal then before it, held:

"The conductor, a witness for the defendant, testified that the deceased, a brakeman, knew that the bridge was low, and that there were no warning signals at the bridge. There was also evidence to show that the deceased had been in the cab of the engine, and that the fireman had told him that it was not necessary for him to go on top of the cars. Held, that the case was a proper one for the jury; that if the deceased knew the location of the

bridge, and that it was a low one, but, by reason of being occupied at the time in the discharge of his duties, did not notice his approach to it, he would not necessarily be charged with contributory negligence."

And it was also held on that occasion that the verdict of $3,000 was not excessive.

The defendant took an appeal to the court of appeals, and a decision was made by that court reversing the judgment, and its opinion is reported in 154 N. Y. 263, 48 N. E. 514, and it was then and there—

"Held, that the essential fact that the death was caused by the bridge was not established by evidence that the deceased was standing, apparently in good health, on the top of a car, just before the train passed under the bridge, which was from four feet seven inches to six feet three inches above the tops of the cars, and that immediately thereafter he was found lying on top of the same car, near the center, in a dying condition, without the production of, or the effort to procure, further evidence that he died from violence instead of disease, such as evidence tending to show a wound or a bruise upon his person."

No other question was discussed or considered in the opinion delivered on that occasion.

Upon the trial now before us, evidence was given tending to show that the train on which the deceased was killed had an Armour refrigerator car next to the engine, and several other Armour and Swift refrigerator cars; and some blood was observed by a witness on the left-hand side of the first refrigerator car; and a witness who went on the day of the accident to Rome, and saw the body of the intestate, testified that he examined the same, and, in speaking thereof, he used the following language:

"He laid on a stretcher, and three of us raised up his head, and the back of his head was all squashed in, and I remember there was a cut on the back of his head. There was a little blood there at the time."

Dr. Millington was called as a witness for the plaintiff, and testified that he was one of the coroners of the county, and that he attended upon the occasion of the inquest upon the body of the deceased, in November, 1887, at Wiggins' undertaking rooms, in Rome. The witness says:

"There an examination was made by Dr. E. J. Lawton, Dr. E. S. Millington, and myself. We found upon the body of Thomas Fitzgerald a fracture of the occipital bone, about three inches back of the ear. It was a multiple fracture, and the bone depressed upon the brain tissue, and there were several smaller fractures; that is, multiple fractures. The bone was broken in several places, and there was blood oozing from both ears, and there was a slight abrasion of the face. There was no autopsy made. The injuries which we found were sufficient to produce immediate death. There was about three inches of fracture. The bones were broken up in small pieces. * * * There was a multiple fracture; that is, the skull was broken in several pieces, and pressed in the brain. * * * The spot that was pressed in was about the size of a quarter. * * * I think the cause of death was the concussion to the brain and the hemorrhage which he had from each ear. I should think it might produce a rupture at the base of the brain."

In the course of the charge delivered by the learned trial judge, he said:

"In the first place, how did Fitzgerald meet his death? There isn't any dispute but what upon this occasion, upon this 11th of November, 1887, a little west of Rome, he was on top of a freight car, in one of the defendant's

trains; that he went upon this car shortly before a bridge was reached which runs over the defendant's road at this point; that, at some point after that bridge had been passed by this train, it was discovered that Fitzgerald was lying upon the car, dead, or nearly dead. In addition to that, evidence has been given upon this trial in regard to certain wounds and injuries which were found upon his person, and evidence has been given with reference to certain blood which it is claimed was seen upon this car. Evidence has also been given here with reference to the height of this bridge, which I think was somewhere in the neighborhood of 17 feet from the track. Evidence has also been given indicating, as the plaintiff claims, that Fitzgerald upon this occasion went upon an Armour car, which was of a certain height,— somewhere in .the neighborhood of 12 or 13 feet; and then evidence has further been given that he, himself, was of a height somewhere over 5 feet; and from all of those facts the plaintiff asks you to find, as established beyond any reasonable doubt in this case, that Fitzgerald met his death by reason of his head having been brought in contact with this bridge. * * * It will be for you to determine here, from all the evidence, whether Fitzgerald did upon that occasion meet with an accident by being brought into collision with this bridge which did cause his death.   Of course, if you find that he died in some other way, entirely disconnected with this bridge,—that he died from disease or from some other cause than the one claimed by the plaintiff,—that would end the action; because, as I have said to you, it is necessary for the plaintiff to establish here by a fair preponderance of evidence that Fitzgerald's death was caused by having his head brought up against this bridge."

We think the evidence given on this trial abundantly warranted the trial judge in making the comments which we have quoted, and others of like character, and in submitting the question to the jury as to whether the deceased came to his end by reason of coming in contact with the bridge of the defendant under the circumstances disclosed by the evidence. The evidence seems to be sufficient to satisfy the most stringent construction of the opinion delivered in the court of appeals, to which reference has been made, and that the plaintiff has given evidence satisfactorily sustaining the burden of showing that the death was caused by contact with the bridge.

2. In May, 1884, the legislature passed an act entitled "An act for the better protection of life and property upon the railroads of this state, to promote the safer and better management of steam railroads." Laws 1884, c. 439.   The second section of that act is as follows:

"Every steam railroad shall, within six months after the passage of this act, erect, and thereafter maintain, such suitable warning signals at every low bridge or structure which crosses the railroad above the tracks, where such warning signals may be necessary for the protection of employees on top of cars from injury."

There was evidence given that the intestate was on his first trip as brakeman; and there was evidence given that he had never been west of Utica; and evidence was given from which it might be found as a fact that he had no knowledge of the bridge in question. It appeared by evidence that there were no telltales or warning signals erected or maintained west of the bridge, as required by statute to which reference has been made. The grade was descending, and the defendant had a rule which provided, viz.:

"In descending grades, the conductors will see that their men are at their posts, and not allow their trains to acquire a greater speed than one mile in four minutes. Conductors and engine men must not violate this rule under any circumstances."

The grade was descending easterly at 13.7 feet to the mile. The grade commenced descending some 1,130 feet west of the bridge, and extended down easterly under the bridge. There was evidence tending to show that it was part of the duty of a head brakeman on a freight train to look out and see that the entire train was intact, there being side lights placed on the side of the caboose at the rear end of the train, which could be seen on a straight track on a clear night. However, on stormy nights the only way to see the rear end of the train was to take the deck or top of the cars, and go back until the light could be seen which was placed on the cupola on top of the caboose, which can only be seen on a straight track from the top of the cars, according to the evidence found in the appeal book..

Lincke, the fireman on the train when the accident occurred, testified that the accident occurred just before daylight, in the morning:

"It occurred at Wheeler's Bridge, over the tracks near Green's Corners. It was a cold, windy morning; very disagreeable. * * * I saw deceased on top of the car before the accident occurred, at a point west of Wheeler's Bridge, a very few moments before it occurred. Think he was standing on the next car to the engine. I don't remember what kind of a car it was. I couldn't say whether it was higher than an ordinary car. When we passed under the bridge, of course the train made a different sound going under the bridge. I looked for this man as soon as we passed through under the bridge and the smoke cleared away, and I couldn't see him, and I went back to look for him. I found him lying on top of the first car. I came back, and reported to the engineer, that he should shut off and blow brakes, and we should stop. I don't know what I said. He appeared dead when I found him first. Then we ran on down to Rome. Then I saw his body again."

It is contended by the learned counsel for the defendant that when the deceased entered the employment of the defendant, because its nature was necessarily hazardous, "he thereby assumed the usual risks and perils of the service, and also those which were apparent to ordinary observation." The assumption made by the learned counsel seems to leave out of view the fact that the intestate had a right to assume that the defendant had performed its duty and obeyed the statute by erecting telltales and maintaining them in the vicinity of the bridge like the one that caused the injuries to the intestate.

It is insisted, also, by the learned counsel for the defendant, that the deceased had an opportunity to learn and know that there were no telltales, and that it was a low bridge, and that his attention had been called to that fact by the conductor. We think the trial judge, in his charge, sufficiently submitted the question to the jury to determine whether the deceased was properly upon the top of the car at the time he received the injuries. He said:

"Of course, if you should find that it was not necessary; that he unnecessarily and without any adequate cause whatever went up upon this car, and was careless in that respect,—why, then the defendant would have established that ground of contributory negligence. If you should find the other way upon it,—that he was justified in doing as he did do,—then you would consider this other question which I have already commented upon somewhat at length: Whether, upon the evidence, as you shall find it to be true in this case upon the one side or the other, this man knew or ought to have known that he was approaching that bridge upon that night, and so have looked out for it, and avoided this accident which is said to have happened to him there. If you find upon that question in favor of the defendant;

that he was careless there; that he knew about this bridge or ought to have known about it, and did not exercise proper care,—that, again, would establish this defense of contributory negligence, and be a bar to recovery."

We think the learned trial judge committed no error in refusing to charge as matter of law that the deceased assumed the risk of coming in contact with this bridge, and that he was correct in confiding to the jury the question whether the deceased was free from contributory negligence. He did charge:

"That if the deceased knew that there were no telltales at the approach to this bridge, and upon this occasion forgot the presence of the bridge or that fact, or both, and that thereby the injury arose, then it was negligence that prevents recovery."

We think that the charge was quite as favorable as the defendant was entitled to have delivered, under the circumstances disclosed by the evidence.

When this case was before the general term, as reported in 88 Hun, 359, 34 N. Y. Supp. 824, it was held:

"That if the deceased knew the location of the bridge, and that it was a low one, but, by reason of being occupied at the time in the discharge of his duties, did not notice his approach to it, he would not necessarily be charged with contributory negligence."

That doctrine has been followed by this court, and the case cited with approval in Benthin v. Railroad Co., 24 App. Div. 303, 48 N. Y. Supp. 503.

In Wallace v. Railroad Co., 138 N. Y. 302, 33 N. E. 1069, it was held that:

"A brakeman on top of a moving train, as matter of law, is not chargeable with negligence, simply because he does not constantly bear in mind the precise location where his train, and where every bridge over the track is."

That case was referred to and commented upon in McGovern v. Oil Co., 11 App. Div. 596, 42 N. Y. Supp. 595, and also in Benthin v. Railroad Co., supra, which latter case cites Ferren v. Railroad Co., 143 Mass. 197, 9 N. E. 608.

We think the questions whether the defendant was negligent, and whether the plaintiff's intestate by his own negligence contributed to the accident, were for the jury, and that their verdict should be sustained. We have looked at the exceptions, and do not find that they present any error which requires us to interfere with the verdict. We think we ought not to interfere with the verdict on the ground that the damages are excessive. The deceased, at the time of his death, was nearly 22 years of age, in good health, and there is some evidence that he paid $20 a month to his mother for his board and washing. Nor do we think that the circumstance that the two prior verdicts were for $3,000 each indicates that the jury in the third trial of this case was influenced by passion or prejudice in delivering its verdict for $3,500. Apparently, the issues were fairly and fully presented to the jury upon the questions involved in the case, and presented by the evidence for the jury's determination. We accept their verdict. We think the learned trial judge was warranted in denying the motion for a new trial made upon the minutes.

Judgment and order affirmed, with costs. All concur, except WARD, J., not voting.